## Jon K. Spaulding v. Michele Butler

[782 A.2d 1167]

No. 99-164

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed August 31, 2001

*Norman R. Blais*, Burlington, for Plaintiff-Appellee.

*Gregg Meyer*, Rutland, and *Karen L. Richards*, Montpelier, *Vermont Legal Aid, Inc.*, for Defendant-Appellant.

**Skoglund, J.** Michele Butler (mother) appeals from a Rutland Family Court order granting Jon Spaulding's (father) motion to modify parental rights and responsibilities, and awarding sole legal and physical parental rights and responsibilities of the parties' son, Nathan, to father, and visitation to mother. Mother argues that the court erred in finding that a real, substantial and unanticipated change of circumstances had occurred, see 15 V.S.A. § 668, and in concluding that awarding custody to father was in Nathan's best interests. See *id.* We affirm in part, reverse in part, and remand.

## I.

The trial court found the following facts.[1] Mother has a child, Michael, from a previous relationship with a man named Pero. Michael is developmentally delayed. Mother's relationship with Pero ended when mother obtained a relief-from-abuse order against him. Father was previously married. When this marriage ended, his ex-wife obtained a relief-from-abuse order against father, which was later amended to include a restraining order against father.

Mother and father met in January 1993. One month later, when Michael was approximately two years old, mother and Michael moved in with father. Mother became pregnant with the parties' child, Nathan. However, the relationship was problematic. According to the court, father has a temper, which revealed itself in violent ways, e.g., when scratched by Michael's cat, he got angry and shot and killed the cat. In May 1993, mother called some friends to come and help her leave the home. While on the phone with mother, the friends heard father "raging in the background and threatening them with a bullet if they came." Father threw mother's belongings out of the house "in a rage." After two weeks, father convinced mother to return, which she did, but only briefly. She eventually left and obtained a relief-from-abuse order against father on the grounds that he had abused both her

---

[1] Because the facts and procedural history of this case are so intertwined, we discuss them together.

and Michael, including beating him with a belt. At the hearing resulting in the order presently on appeal, father testified that the parties never argued and that he could not understand why mother left him. The court found that father "was not credible in his testimony" and that "Mr. Spaulding physically abused Michael, and was threatening to Ms. Butler and placed her in fear of imminent serious physical abuse."

Nathan was born on December 7, 1993. Father filed a parentage case, seeking to establish parentage and parental rights and responsibilities with respect to Nathan. In January 1994, mother was awarded temporary sole legal and physical rights and responsibilities. Father was denied visitation. At mother's request, the court also amended the June 1993 relief-from-abuse order to include a no-stalking provision. In March 1994, father obtained an order providing for visitation.

In the spring of 1994, father entered into a relationship with his present wife, Penelope, who became actively involved in issues concerning Nathan. She took over arranging father's visits with Nathan and wrote letters to mother telling her how she should be taking care of Nathan. The court found that Penelope's involvement interfered in father and mother's ability to communicate directly over Nathan.

In June 1994, at mother's request, the court renewed the provisions of the June 1993 relief-from-abuse order, including the no-stalking provision.

In July 1994, mother began therapy with Meredith McCartney of Community Mental Health Center, to get help coping with Michael's special needs. This therapy continued, on a regular basis, for approximately a year. In this regard, the court found mother to be a concerned parent, willing to take advantage of available resources, but somewhat "overwhelmed by powerful forces around her." It is not clear what powerful forces the court was referring to. Mother brought both boys to the sessions and "[i]n Ms. McCartney's presence, [mother] was able to use appropriate parenting methods in managing the two children. Nonetheless, Michael took up so much of her attention, due to his special needs, that Nathan received less attention."

In September 1994, the court issued a final order granting sole legal and physical parental rights and responsibilities of ten-month-old Nathan to mother, and unsupervised visitation to father. Pursuant to

the parties' stipulation, the court deleted the no-stalking provisions of the June 1994 relief-from-abuse order.

Over the next year, the Spauldings, father and Penelope, began taking pictures of Nathan to document when he arrived for a scheduled visit dirty or bruised. At some point during this period, testing showed that Nathan began to be developmentally delayed.

During a visit in August 1995, father noticed that Nathan had a bad diaper rash. Mother had been aware of the rash and used an over-the-counter ointment to treat it. When that failed, she sought help from a doctor who prescribed a prescription ointment. Father took Nathan to the hospital and was given an ointment that began to clear up the rash. The following weekend, father noticed, the rash was bad again. This pattern persisted. The court found that mother had "pursued appropriate care for treatment of the rash, but that she was not able to follow through consistently in order to clear up the rash, and that as a result, Nathan repeatedly suffered a severe and painful rash that was preventable."

In August of 1996, Nathan was tested for lead poisoning and found to have unacceptable levels of lead in his blood. At the hearing, mother testified that she was later contacted and told that there was an error in the test. The court made no finding on this issue, stating: "There is no indication one way or another whether it is accurate that there was an error." In September 1996, mother, Nathan and Michael returned to weekly therapy with Ms. McCartney because the boys were biting each other on a regular basis.

In April 1997, during a visit, father found marks on Nathan's body where Michael had bitten him, and took Nathan to the hospital. The court found that father "was dishonest about Nathan's custody status," telling hospital personnel that he had custody of Nathan. The hospital reported the marks to SRS. Father filed a relief-from-abuse petition in which he requested transfer of custody to himself. After hearing, the court found abuse based on mother's failure to prevent Michael from hurting Nathan and issued a relief-from-abuse order transferring custody to father and providing for mother to have supervised visits with Nathan for four hours a week. Father then filed the motion to modify the parentage order presently at issue. In the order now on appeal, the court found that mother had been aware of and concerned about the bite marks and had shown them to a public health worker at a clinic. In August 1997, SRS completed its investigation of the bite marks and found father's allegations of abuse unsubstantiated. In September 1997, the parties stipulated to unsupervised visits between

mother and Nathan for three weekends a month, and to a professional evaluation of mother's interactions with Nathan.

On October 14, 1997, Nathan came back from a visit with mother with marks on his body; mother told father the marks were cold sores. Father took Nathan to the hospital, where it was determined that the marks were cigarette burns, and a report was made to SRS. The following week, father learned that Nathan had fallen out of a second-story window during a visit with mother. At that time, mother determined that Nathan was fine and did not seek medical care. Father reported the fall to SRS and filed a motion to stop visits. In November 1997, the court issued an order terminating Nathan's visits with mother pending SRS's investigations of the marks on Nathan's body and of his fall.

In the meantime, Dr. Peter Aines, a psychologist, had begun evaluating mother, pursuant to the parties' September 1997 stipulation. He requested supervised visits so he could observe mother and Nathan interacting. A guardian ad litem also supported resumption of visits. However, because the parties could not agree on the arrangements for supervised visits, mother did not visit Nathan for several months. The court found

> that a contributing factor was that Ms. Butler, who is a person who tends to be overpowered by others and can be overwhelmed by the needs of her other child Michael, was unrepresented and was being presented with proposals from Mr. Spaulding's attorney that she not have any contact at all with Nathan until he was ten. Ms. Butler did not pursue seeing Nathan as actively as she might, but she was also dealing with some fairly strong forces working against her. She did not have the ability or strength to overcome those forces and maintain a relationship with Nathan, even though she was being urged on by the evaluator and GAL.

In March 1998, SRS attempted to investigate an allegation that Nathan and another child had been showing each other their private parts in the home of a friend of the Spauldings. Father refused to allow SRS to investigate. According to the court: "The lack of cooperation suggests that [father] is willing to use the SRS reporting mechanism for his own benefit to build a record of abuse of Nathan against Ms. Butler, but he is not open and cooperative when there is any suggestion involving possible claims of abuse connected with his own household."

In June 1998, after six months without a visit between mother and Nathan, supervised visits were reinstated, the first visit taking place in the evaluator's office. While acknowledging that it would be hard for Nathan to reestablish a relationship with his mother after not seeing her for so long, the court found that Nathan's response to this first visit was "beyond what is reasonable to expect" in that he avoided his mother and played only with the evaluator. The court noted that "Mr. Spaulding, with very active involvement on the part of Penelope, has engaged in a *long term persistent campaign to cut off any relationship between Nathan and Ms. Butler.*" (emphasis added).

Nathan began to show a lack of desire to go on visits. According to the court, this was

> not surprising for several reasons. For one thing, he had had extremely limited contact with his mother over the previous seven or eight months. In addition, his experience with supervised visits included the experience of having the Spauldings remain on the premises, with Mr. Spaulding and/or Penelope and some of the Spaulding children walking around and observing what was going on, while he was visiting with Mrs. Butler. . . . Third, the testimony as a whole in this case, and the evaluation of the demeanor of the witnesses, leads the Court to find that *the Spauldings had engaged in a campaign of presenting Ms. Butler to Nathan in a very negative light.* Rather than encouraging a constructive relationship, they presented her to him as a person who represented potential abuse to him. (emphasis added).

On July 2, 1998, SRS completed its investigation into the cigarette burns and found father's allegations of abuse unsubstantiated. Initially SRS did substantiate abuse by mother for failing to protect Nathan with respect to his fall from the window. However, in December 1998, SRS reversed itself and determined that insufficient information existed to substantiate allegations of abuse.

In August 1998, father and Penelope got into an argument during which father lost his temper, slapped Penelope in the face and engaged in other threatening behavior. Penelope called the police, who came and defused the situation. When the police went inside to speak with Penelope, they found Nathan lying in a fetal position. Two days later, the Spauldings filed a new relief-from-abuse petition against mother, based on the same allegations as the previous petitions and including a

new allegation that Nathan had reported seeing mother and a man engaged in sexually suggestive dancing. Visitation was suspended. After a hearing on the petition, it was dismissed, at which time father became angry and had to be restrained. The court also issued a temporary order providing for visitation between mother and Nathan.

The alleged dancing incident was reported to SRS. SRS and the police decided to interview Nathan about the incident together, and instructed father and Penelope not to talk with Nathan about the interview. The Spauldings apparently did not comply. According to the court:

> The police investigator noted that Nathan used words to describe the incident that he did not understand. For example, he talked about breasts but he could not show what breasts were on an anatomically correct doll. The police found it difficult to determine the extent to which Nathan at age four and one-half was accurately reporting anything that might have happened a year to eighteen months earlier. Nathan was able to demonstrate using anatomically correct dolls a sexy kind of dancing between the dolls. It appears that he must have seen something of that nature somewhere. It is not clear where he saw it. Mr. Spaulding has in the past watched "dirty movies" in his home. Penelope is a very religious person and does not do so. At the time this issue arose, Nathan had no unsupervised contact with Ms. Butler for over a year and a half.

At the time the court issued its final order on father's motion to modify, the police investigation remained unresolved, and the results of SRS's investigation had not been received.

On October 31, 1998, the evaluator attended his second visit between mother and Nathan. By this time the relationship had deteriorated — Nathan refused to interact with mother.

In February 1999, the court granted father's motion to modify, and awarded father sole parental rights and responsibilities over Nathan and mother supervised visitation for six months, transitioning to unsupervised visitation. The court ordered father to pay the costs of any supervised visitation because it found that he was *primarily responsible for the serious disruptions in the relationship between Ms. Butler and Nathan,* including the long-term disruption of visitation." (emphasis added). Mother moved for reconsideration, which the court denied.

Mother appeals from the final order and from the denial of her motion to reconsider.

## II.

"[W]hen reviewing the factual findings of a trial court we view them in the light most favorable to the prevailing party below, disregarding the effect of any modifying evidence, and we will not set aside the findings unless they are clearly erroneous." *Stickney v. Stickney,* 170 Vt. 547, 548, 742 A.2d 1228, 1230 (1999) (mem.). "We will uphold factual findings if supported by credible evidence, and the court's conclusions will stand if the factual findings support them." *In re T.L.,* 169 Vt. 550, 551, 726 A.2d 496, 497 (1999) (mem.). We will, however, reverse if the court's findings are not supported by the evidence, *Johnson v. Johnson,* 163 Vt. 491, 496, 659 A.2d 1149, 1152 (1995), or if its conclusions are not supported by the findings. *Begins v. Begins,* 168 Vt. 298, 301, 721 A.2d 469, 471 (1998).

When faced with a motion to modify a parental rights and responsibilities order, the court must make a threshold finding that there has been a real, substantial and unanticipated change of circumstances. See *Pill v. Pill,* 154 Vt. 455, 458-59, 578 A.2d 642, 644 (1990); 15 V.S.A. § 668. Once the court has found the requisite change of circumstances, it must determine what arrangement is in the child's best interests. See *Gates v. Gates,* 168 Vt. 64, 69, 716 A.2d 794, 798 (1998); 15 V.S.A. § 668. The burden of proving that a change in custody is in the child's best interests is on the moving party. See *Lane v. Schenck,* 158 Vt. 489, 497, 614 A.2d 786, 790 (1992). Trial courts have broad discretion in determining the best interests of the child. See *Myott v. Myott,* 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988).

Mother argues that the court erred both in finding that there had been a real, substantial and unanticipated change in circumstances, and in concluding that awarding custody of Nathan to father was in Nathan's best interests. We conclude that the court correctly found a real, substantial and unanticipated change in circumstances, but that its conclusion that awarding custody of Nathan to father was in Nathan's best interests was in error.

In determining that a real, substantial and unanticipated change in circumstances had occurred, the court defined the relevant time period as between September 1994, the date of the modified final parentage order, and April 1997, the date father filed the motion to modify parental rights and responsibilities. During this time period, the court noted that there had been a

pattern of poor care of a severe and painful diaper rash, the severity of which was unnecessary as shown by the improvement in the rash during the weekend visitations with Mr. Spaulding; a pattern of Nathan appearing for visits with Mr. Spaulding with a number of bruises and marks on his body; a lead test indicating lead poisoning of Nathan with no information that the problem had been taken care of; a pattern of biting behavior between Michael and Nathan that had not improved despite the work of Ms. Butler with Meredith McCartney in therapy; delays in Nathan's developmental milestones as indicated by testing through Triple E and Stepping Stones; and severe bite marks on Nathan from Michael on April 11, 1997.

Based on these facts, the court found a real, substantial and unanticipated change in circumstances.

■ "The moving party has a heavy burden to prove changed circumstances, and the court must consider the evidence carefully before making the threshold finding that a real, substantial and unanticipated change of circumstances exists." *Pill*, 154 Vt. at 459, 578 A.2d at 644. Evidence that a child has begun to show signs of developmental delay while in a parent's custody, coupled with evidence that the parent was not properly addressing the issue or was contributing to it by neglect, for example, would support a finding of a real, substantial, and unanticipated change of circumstances. In this case, the court found that testing of Nathan showed that he had begun to be developmentally delayed. The court further noted that Michael's needs placed great demand on mother's time and attention, and that, as a consequence, Nathan received inadequate attention. The court coupled its finding regarding Nathan's developmental delay with its finding that Nathan suffered from repeated physical injuries, a situation brought about by what the court characterized as "a chronic low level of unintentional neglect" on mother's part.[2] Therefore, the court's finding of a real, substantial and unanticipated change in circumstances finds support in the record.

However, we hold that the court erred in its evaluation of and conclusions regarding Nathan's best interests. In determining that

---

[2] The court also relied on the alleged elevated levels of lead in Nathan's system. The court, however, heard conflicting evidence on this issue and failed to resolve the dispute with a finding.

awarding custody of Nathan to father was in Nathan's best interests, the court concluded that factors one through four, and factor six, favored father, factors five and eight favored mother, factor seven favored neither parent, but did not decide which parent factor nine favored. According to the court, factors one and three were the primary reasons for its decision that awarding custody of Nathan to father was in Nathan's best interests. With regard to factor one, "the relationship of the child with each parent and the ability and disposition of each parent to provide the child with love, affection and guidance," 15 V.S.A. § 665(b)(1), the court stated:

> At this point, Nathan has an estranged relationship with his mother. Prior to April of 1997 and the change in custody brought about by court orders, it was a full parent/child interaction, although Nathan's needs were not able to be met fully due to his mother's attention being diverted by Michael's challenging behavior. The events since then have so strained the relationship that it will require time for it to be rebuilt. His mother has strong love and affection for him. . . . Her ability to provide it is limited by the huge demands made on her time and attention by Michael, and by her weakness in the face of powerful forces.

The court determined that father had "a full parent/child relationship with Nathan," and had demonstrated his love and affection and an ability and willingness to provide guidance. However, it stated:

> His ability and disposition to provide guidance is negatively affected by his *excessive use of police, SRS and emergency legal procedures to interfere with Nathan having a constructive relationship with his mother.* He is willing to lie in order to achieve his objective to become Nathan's primary parent. Nonetheless, as a whole, this factor favors Mr. Spaulding. (emphasis added).

The court's conclusion that factor one favors father is undermined by its findings that father was engaged in a long-term, persistent campaign to cut off any relationship between Nathan and mother. It had ordered father to pay the costs of supervised visitation because it found father primarily responsible for the serious disruptions in the relationship between mother and Nathan. Furthermore, the fact that father currently has a full parent/child

relationship with Nathan while mother has an estranged relationship is due, in large part, to father's attempts at alienation.

As we stated in *Renaud v. Renaud*, 168 Vt. 306, 309, 721 A.2d 463, 465-66 (1998), "[a]cross the country, the great weight of authority holds that conduct by one parent that tends to alienate the child's affections from the other is so inimical to the child's welfare as to be grounds for a denial of custody to, or a change of custody from, the parent guilty of such conduct." Here, the court repeatedly found that father had actively worked to alienate Nathan from his mother. To conclude, then, that father's success in that regard gives him the advantage in factor one is untenable. See *Begins*, 168 Vt. at 302, 721 A.2d at 472 (" '[A] parent who willfully alienates a child from the other parent may not be awarded custody *based on that alienation.*' ") (quoting *McAdams v. McAdams*, 530 N.W.2d 647, 650 (N.D. 1995) (emphasis in original)); *Renaud*, 168 Vt. at 309, 721 A.2d at 466 ("a sustained course of conduct by one parent designed to interfere in the child's relationship with the other casts serious doubt upon the fitness of the offending party to be the custodial parent").

■ Under factor two, the court is to consider "the ability and disposition of each parent to assure that the child receives adequate food, clothing, medical care, other material needs and a safe environment." 15 V.S.A. § 665(b)(2). The court determined that factor two favored father. According to the court, while mother may be able to provide an adequate material and safe environment if she were not having to meet Michael's needs as well as Nathan's, the court found:

> [I]t appears that she has a pattern of relationships with men whose behavior threatens the safety of the environment for her children. The facts show that her relationships with Mr. Pero, Mr. Spaulding, and Mr. Havens all produced threatening and abusive environments for her children.

The court noted that father was able to provide an adequate material environment, but that:

> The safety of the environment he offers is questionable considering his history of violent domestic relationships in the past, his history of shooting a cat with a gun on small provocation, and the recent incident in which he reacted to stress by slapping his wife and breaking a chair with four and two year old children in the home. There are problems with safety in both homes. This factor favors Mr. Spaulding on the

whole because of his better ability to follow through on providing routine basic medical care.

It is confusing at best to fault mother for having relationships with abusers, citing father as one of her lapses in judgment, but nonetheless conclude that awarding custody to father is in Nathan's best interest. While it is true that mother's relationship with Pero and with father were abusive, the court found that she responded to each situation by obtaining relief-from-abuse orders against both men. The record is silent as to the resolution of her relationship with Havens. Thus, the court's conclusion that there is a problem with safety in mother's home is speculative at best. See *In re Farley*, 469 N.W.2d 295, 302 (Mich. 1991) ("When [the mother's] lawyer questioned the professionals whether [the mother] could, as a single parent, provide a fit home for the children, they dodged a direct response by stating that they were concerned that she would enter into another relationship with a man who might again abuse her and the children. There is no evidence other than myth of such a risk or that [the mother] would do so.").

On the other hand, the court found that father had threatened his first wife, causing her to obtain a relief-from-abuse order against him; had shot and killed Michael's cat; had threatened the mother's friends; had physically abused Michael and threatened mother, placing her in fear of serious physical abuse, thereby causing mother to obtain a relief-from-abuse order against him; had recently physically abused his current wife, Penelope, in front of Nathan, causing Nathan to curl up in a fetal position; had recently flown into a rage in the courtroom and had to be restrained; and generally has a temper. Thus, the court's findings support its conclusion that the safety of the environment father offers is questionable. Given the above, to the extent the court based its conclusion that factor two favored father on its determination that the risk of violence was equal in both households, its conclusion was in error.

With regard to factor four, "the quality of the child's adjustment to the child's present housing, school and community and the potential effect of any change," 15 V.S.A. § 665(b)(4), the court stated:

Nathan has been living with Mr. Spaulding and as a member of the Spaulding household for nearly two years. It would be a substantial change for him to leave that household at this point. If he were to move back with his mother, he would be returning to the apartment that he lived in before. Since he

has not yet started school, schooling is not an issue. This factor favors Mr. Spaulding.

As with factor one, the court's conclusion with regard to factor four is tainted because the fact that Nathan has been living with father for two years is due, in large part, to father's successful attempts at alienation, including his "excessive use of police, SRS and emergency legal procedures to interfere with Nathan having a constructive relationship with his mother." See *Begins*, 168 Vt. at 302, 721 A.2d at 472; *Renaud*, 168 Vt. at 309, 721 A.2d at 466.

■ With regard to factor six, "the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development," 15 V.S.A. § 665(b)(6), the court stated:

> At this point, Nathan's relationship with his mother, who was previously his primary care giver, is almost nonexistent and negative. It would not make sense for him to return to her as his primary parent at this time. He has been led to be fearful and distrustful of her. Mr. Spaulding has provided the primary parental care for quite some time pursuant to court orders entered after court hearings. This factor favors Mr. Spaulding.

Again, the court's conclusion in this regard is undermined by its findings that father intentionally alienated Nathan from mother, thereby eroding mother's relationship with Nathan and enabling father to become Nathan's primary caretaker. See *Begins*, 168 Vt. at 302, 721 A.2d at 472; *Renaud*, 168 Vt. at 309, 721 A.2d at 466.

Finally, the court did not decide which parent factor nine favored. Under factor nine, the court is to "consider evidence of abuse, as defined in section 1101 of this title, and the impact of the abuse on the child and on the relationship between the child and the abusing parent." 15 V.S.A. § 665(b)(9). According to the court:

> There is evidence of a chronic low level of unintentional neglect on the part of Ms. Butler during the period Nathan was primarily in her care, as well as a risk that if he lives with her he would be exposed to abusive conduct from others with whom she has relationships. With Mr. Spaulding, there is a risk of exposure to domestic violence as that has been his pattern with all three of the women in his life and the August incident indicates that this continues to be a realistic risk.

The court further noted: "There are risks to Nathan associated with living with his father, specifically there is a risk that Nathan will be exposed to domestic abuse. Unfortunately, *such a risk is present in both households, and the risk is approximately equal in both households*." (emphasis added).

As we stated above, the court's conclusion that there is a risk that, if Nathan lives with mother, he would be exposed to abuse from future boyfriends is speculative at best, while the court's conclusion that there is a "realistic risk" that father is likely to continue to be violent is supported by its findings. Therefore, the court's conclusion that the risk of domestic abuse is approximately equal in both households is erroneous. Given the court's findings, the risk of domestic abuse is clearly greater in father's household. Therefore, the court should have weighed this factor in mother's favor.

The court concluded that awarding custody to father was in Nathan's best interests, despite having specifically found that father was a batterer, a liar, and that he had consciously and deliberately alienated Nathan from mother. As Dr. Aines, the family evaluator, stated in his recommendations, which were submitted to the court:

> The Spaulding's [sic] in their anger and zeal to protect Nathan for [sic] abuse and neglect have alienated him from his mother, and in doing so have contributed significantly to his emotional difficulties. If he does not buy into the idea that his mother is bad, he faces the fear of losing his father and step mother's love. This causes unbearable stress for Nathan, relieved only be [sic] ingratiating himself to them. There is the additional difficulty that Mr. Spaulding has in managing the conflict between his dependent needs for attention, care and emotional support and his difficulty being assertive toward women. Physical aggression toward his partners has occurred in his last three sustained relationships. The latest incident of aggression occurred in the presence of Nathan and his stepbrother, Morgan, and this is not in their best interests.

In summary, the court's conclusion that factors one, two, four, and six favor awarding custody to father is not supported by the findings, and the court's failure to conclude that factor nine favors mother is erroneous. "An award so flagrantly at odds with the findings simply cannot be allowed to stand." *Begins*, 168 Vt. at 303, 721 A.2d at 473. Accordingly, we conclude that the award of parental rights and

responsibilities must be reversed, and the case remanded for reconsideration of that issue.[3] The family court's reconsideration should be made in light of the views expressed herein, and should account for any change in circumstances that may have occurred while this appeal was pending. In order to maintain stability for Nathan, however, custody of Nathan shall remain with father, and all orders affecting visitation shall remain in place, pending further order of the family court.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

**Dooley, J.,** dissenting. I believe that any fair observer of our child custody opinions, both majority and dissent, would conclude that there is a significant gap between the standard of review we say we employ,

---

[3] The dissent contends that, by applying a standard of review which recognizes the broad, but not unbounded, nature of the factfinding and decisionmaking power of the trial courts, which in this case and in *Cloutier v. Blowers* results in the reversal of the family court's decisions, we are in fact transitioning away from deferential and toward de novo review of child custody determinations. In doing so, the dissent mischaracterizes the standard of review applied in these cases, both in theory and effect. Appeals in our judicial system may be founded upon errors of law or findings of fact not supported by the evidence. In family law cases, if the law is applied correctly, the trial judge is accorded a great deal of deference in making a custody decision. That is true for all the reasons cited by the dissent, but it is appropriate to afford that discretion only if the trial judge follows the rules of law that apply to the case. In these cases, errors of law were made. In *Cloutier v. Blowers*, the court made legal conclusions based on findings not supported by the evidence and others not supported by its own findings. Further, it elevated the best interests of the mother over those of the child. In *Spaulding v. Butler*, the court made legal conclusions not supported by its own findings. Such errors are for correction by the appellate court. What the dissent is really arguing is that we abandon appeals in cases based on errors of law, and, with that, abandon the role of the appellate court to provide guidance on general principles of law within which discretion may be exercised, in favor of a system that sweeps all questions in family cases under the abuse of discretion standard. If we adopted the dissent's approach, we could affirm every case, given the trial court's broad discretion and the deference afforded its decisions. The result of such an approach would be no meaningful appeal in family cases. Further, we would thereby increase, not decrease, the decisional disparities that can result in family cases. As acknowledged in each of these decisions, the discretion enjoyed by the family court is not absolute — the court may not overstep the legal boundaries which provide the authority for the decisions it renders. At the very least, the role of the appellate court is to ensure that the same rules and protections of law, including the right to a fair hearing under the due process clause, is available to litigants in family cases. It is just as important in a family case to review the findings and the record as it is in a criminal or tort case. Necessarily, this will result in reversals that may cause upheavals in the lives of children and families, but that is not a reason, in and of itself, to abandon our role as a meaningful appellate court.

and our actions in resolving the cases before us. I fear that gap is growing, and we are moving much closer to de novo review than we are willing to admit. The two cases in which this dissent is filed are, in my judgment, examples of this trend. Although the cases are different, and the issues are different, they share one common element — that is, the family court decisions would be affirmed if we actually employed the standard of review set out in the beginning of the majority opinions and in our precedents. Thus, I am filing this common dissent to say that I believe the direction in which we are going in appellate review of custody decisions is wrong.

I acknowledge that the pressures that exist to abandon or "fudge" deferential standards of review in custody decisions are real. Custody decisions are critically important to the child or children who will grow up, good or bad, in the new custodial situation. The interests of children in their family and home environment may be the most important interests we seek to protect in our judicial system. Unlike in many areas of the law, most of us have life experiences we draw on in facing custody questions. We are, accordingly, more likely to abandon a deferential posture to rely upon our own knowledge and experience. Finally, the consequences of excessive discretion in custody determinations are troubling, a subject of much scholarly interest in recent years. See generally C. Schneider, *Discretion, Rules, and Law: Child Custody and the UMDA's Best-Interest Standard*, 89 Mich. L. Rev. 2215 (1991).

The effect of these pressures is to elevate the desire to produce the "right" answer for the child in the case before us over our normal appellate co-goal of producing fair and predictable rules of law to guide future cases. If the result were to achieve a balance between predictable and fair rules, on the one hand, and judicial discretion on the other hand, I would be less concerned. I think, however, the real result is to substitute our discretion and individual judgment for that of the family court in pursuit of the "right" outcome for the case before us. By this process we are squaring discretion, not containing it.

I can think of no area where the need to contain the exercise of appellate discretion is greater. I won't rehash the general reasons for deferential standards of review based largely on the fact that the family court, often aided by a guardian ad litem and professional evaluators, saw and heard the parties, particularly the parents, and we are dealing solely with transcripts. Those reasons should give us pause, but there are additional reasons almost unique to child custody litigation. We know from numerous studies that custody litigation has

a tremendous adverse impact on the children who are the subject of that litigation. See A. Schepard, *Parental Conflict Prevention Programs and the Unified Family Court: A Public Health Perspective*, 32 Fam. L.Q. 95, 102-06 (1998); E. Brandt, *The Challenge to Rural States of Procedural Reform in High Conflict Custody Cases*, 22 U. Ark. Little Rock L. Rev. 357, 359-60 (2000). Whatever order the court issues as a result of that litigation, the destructive impact of the litigation itself, and the accompanying adversary contentiousness of the parents, may leave the greatest mark on the growth and development of the child. In the cases before us, unless the parties settle after our decision, that litigation will occur at least three times — twice in the family court and once in this Court. I seriously doubt that there is any longer a "right" answer, even if we can discover it. The real need is to stop the contentious litigation as soon as possible, not to discover a better custody order.

Unfortunately, our decisions breed further appeals. See G. Crippen, *The Abundance of Family Law Appeals: Too Much of a Good Thing?*, 26 Fam. L.Q. 85, 100-01 (1992). There is no predictable rule of law in either of the majority decisions in the cases before us, except with respect to considering the age of a prospective custodial parent and, even there, it is unclear what is the holding of the Court. What there is, instead, is a clear indication that the Supreme Court will substitute its judgment for that of the family court. Thus, the message to any parent who has lost a custody case is to try an appeal to this Court, which may weigh the relevant factors differently.

There are, I believe, three main ways in which the decisions in *Cloutier v. Blowers* and *Spaulding v. Butler* are inconsistent with our proper limited role in custody appeals. I discuss my reasons for dissenting from the majority decisions under the headings below.

## I. Adoption of Inappropriate Rules

Custody determinations are now governed by statute, 15 V.S.A. § 665. That statute requires that the family court be guided by the best interest of the child, *id.* § 665(b), and sets out nonexclusive factors in determining the best interest of the child. Because the list is nonexclusive, the court may consider other factors bearing on the best interest of the child. *Hansen v. Hansen*, 151 Vt. 506, 508, 562 A.2d 1051, 1053 (1989). While requiring that the family court consider all the statutory factors, if relevant, the Legislature has prohibited the court from establishing a preference based on the sex of the child, the sex of the parent or the financial resources of a parent. 15 V.S.A. § 665(c).

The statute, however, contains no authorization for this Court to add categorical rules that restrict the trial court from determining the best interest of the child. In *Cloutier v. Blowers*, the majority has done exactly that, interfering with the proper and necessary discretion of the family court.

In *Cloutier*, the family court held that because all other factors were in balance, it had to give critical weight to the age of the parents who sought custody. The majority rejects this approach although its ground is unclear. It holds either that (1) the relationship between the age of the proposed custodian and the best interest of the child can be considered only if there is evidence, presumably expert evidence, to support such consideration; or (2) the age of the custodian may not be considered because it results in discrimination based on age.

The first alternative is contrary to our precedents, intended to support the discretion of family court judges. In *Harris v. Harris*, 149 Vt. 410, 546 A.2d 208 (1988), the mother, who did not prevail in the custody dispute in the trial court, argued that the trial judge could not consider that she was living out of wedlock with a man, without expert testimony to show the effect on the best interest of the child. We rejected that argument as follows:

> While the expert testimony would have been helpful in this case, we agree with the trial court that the evidence fell in an area where the court could evaluate it without expert testimony. Such evaluation was expected under the language of § 665(b)(7). We concur with the Supreme Court of Kentucky which, facing a similar statute and similar evidence, said:
>
>> A trial judge has a broad discretion in determining what is in the best interests of children when he makes a determination as to custody. In many instances he will be able to draw upon his own common sense, his experience in life, and the common experience of mankind and be able to reach a reasoned judgment concerning the likelihood that certain conduct or environment will adversely affect children. It does not take a child psychologist or a social worker to recognize that exposure of children to neglect or abuse in many forms is likely to affect them adversely. Many kinds of neglect or abuse or exposure to unwholesome environment speak for themselves, and the proof of the

> neglect or abuse or exposure is in itself sufficient to permit a conclusion that its continuation would adversely affect children.
>
> We also think the trial court is not precluded from consideration of circumstances where the neglect, abuse, or environment has not yet adversely affected the children but which, in his discretion, will adversely affect them if permitted to continue. In other words, a judge is not required to wait until the children have already been harmed before he can give consideration to the conduct causing the harm.

*Krug v. Krug*, 647 S.W.2d 790, 793 (Ky. 1983). Accordingly, we hold that the trial court did not err in accepting the evidence and relying on it in the custody determination.

*Id.* at 416-17, 546 A.2d at 212-13. We have reiterated the right of the family court judge to use common sense and common and life experience in making custody determinations. See *Payrits v. Payrits*, 171 Vt. 50, 53, 757 A.2d 469, 472 (2000); *Bissonette v. Gambrel*, 152 Vt. 67, 70, 564 A.2d 600, 601 (1989).

Ironically, we applied exactly this principle to the issue of whether the court could consider the age of the proposed custodian in making a child custody decision. In *Miles v. Farnsworth*, 121 Vt. 491, 494-95, 160 A.2d 759, 761 (1960), we held that the trial court could consider the "infirmatives of advanced years" of the custodian as a factor in determining the custody of the child.

This is an exceptional case. We can take judicial notice that the average life expectancy of an American male is 74 years.* Centers for Disease Control and Prevention, United States Life Tables, 1998, *National Vital Statistics Reports*, Feb. 7, 2001, at 2. Thus, in this case, there is a substantial chance that father will be unable to provide guidance to the child up until he reaches the age of majority of 18 years. As the majority of courts, including this Court, have held, see *Phelps v. Phelps*, 446 S.E.2d 17, 22 (N.C. 1994) ("We conclude that a trial court should . . . be allowed to consider a parent's age and its potential effect on the welfare of the child as a factor in its determination of what is in the best interest of the child."); *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983) (court may consider

---

* Having reached 59 years of age, father's remaining life expectancy is approximately twenty more years. Centers for Disease Control and Prevention, United States Life Tables, 1998, *National Vital Statistics Reports*, Feb. 7, 2001, at 2.

numerous factors including the "physical and mental health and age of the parents"); *Ex parte Devine*, 398 So. 2d 686, 696 (Ala. 1981) (court should consider numerous factors including "the characteristics of those seeking custody, including age, character, stability, mental and physical health"), the family court should be able to consider the age of a prospective custodian as it bears on the best interests of the child.

If the majority is intending to compromise on the consideration of age by requiring expert testimony, I think the compromise is unwise. Custody litigation is already extraordinarily expensive for all but the most wealthy parents. Adding more complexity and cost to such litigation is a step in the wrong direction.

The second alternative — that it is always unfair and discriminatory to consider the age of a parent in determining custody — is inconsistent with the fundamental policy of custody adjudication as emphasized in the majority opinion. On another issue, the majority points out that the family court must act based on the best interests of the child, not the interest of the parent. On this issue, however, the majority is violating that principle, acting on the interest of the father even though it is inconsistent with the best interest of the child. Although a few isolated precedents support this approach, the vast majority of decisions hold that the court can consider the age of a prospective custodian in making a custody award where it is in the best interest of the child to do so, as I have set out above. That is the holding of *Miles v. Farnsworth*. We should reject the categorical rule the majority apparently espouses.

I reiterate my point that categorical rules that restrict family court discretion in determining the best interest of the child are not good policy. Whatever the reasons espoused for them, fundamentally they involve substituting our judgment for that of the family court. In this unusual case where consideration of the remainder of the statutory factors produced no clear choice of custodian, consideration of the age of a parent should be in the court's discretion.

## II. Placing the Family Court Decision in a Bad Light

The *Cloutier* decision has another aspect that is an indication that we are not seriously applying the limited standard of review that binds us. In reviewing findings of fact, we must "view them in the light most favorable to the prevailing party." *Stickney v. Stickney*, 170 Vt. 547, 548, 742 A.2d 1228, 1230 (1999) (mem.). A party challenging conclusions of law must overcome the "great deference" we give to the court's conclusions, and we must "make all reasonable inferences in

support of the court's judgment." *Bevins v. King*, 147 Vt. 203, 206, 514 A.2d 1044, 1046 (1986). Put another way, this Court must "construe [findings] so as to support the judgment, if possible." *Armstrong v. Hanover Ins. Co.*, 130 Vt. 182, 185, 289 A.2d 669, 671 (1972).

I find no indication in the majority opinion that it gave deference to the family court's conclusions or that it construed the findings to support the judgment. Rather than fairly interpreting the family court findings and rationale in support of its decision, the majority recharacterizes the decision in a way that makes it virtually indefensible. In doing so, it raises a new issue not considered by the family court or argued by the parties. We now know how the majority would have decided the case had it been the family court. We have, however, done a disservice to the parties, the child and the trial court by introducing our issue on appeal.

Although the family court decided the case primarily on the relative age of the parents, it found that at least one additional factor favored the mother as custodian, as follows:

> While either could discharge the role of parent adequately, the mother shows more promise for long term stability and consistency of caretaking. The mother has shown she can capably provide for the child's broad breadth of needs. She has successfully raised a family. She has endured and overcome one of life's most poignant tragedies with the death of a child. She has focused her life and emotional resources to successfully raise this child.
>
> This emotional investment to this child is so strong that any attempt to deny her the primary role of caretaker would destroy her. Her emotional attachment is not unreasonable. Her need to raise this child should be encouraged for both her good and the child's good.
>
> Should she lose the primary role of caretaker, this would adversely impact on the child. There is no need of the child's met by that drastic result. The child can have the best of both parents as the situation permits. Perhaps, they will become more comfortable with each other as parents, now that fear of removal of the child from the mother is gone.

In one page of his brief, the father attacked this additional consideration as focusing on the mother's needs and not the best interest of the child. I discuss that below; for now, the point is that the father made no additional claims about the court's rationale.

The majority found this rationale to be inadequate and unsupported by the findings, at least as to the factor contained in § 665(b)(5). The Court describes the family court's rationale as follows: (1) mother and father, who were not married, decided to have a child to fill a void in mother's life created by the tragic death of one of her children; (2) mother expected that the father would want little role in the child's life; (3) to mother's frustration, father took a very active role with the child and attempted to provide for both the child and the mother; (4) as a result, mother accused father of all sorts of misconduct during the custody case, but the family court failed to find that the misconduct had occurred; and (5) mother made the accusations to minimize the role of father in the child's life. Once it has described the family court's rationale in this way, it is no surprise that the majority concluded it did not support a finding that mother as a custodian would better foster for the child a positive relationship and frequent contact with the father than father as custodian would foster with the mother. Indeed, it has recast the family court's rationale so it supports custody in the father, not the mother. Consistent with its description of the family court's rationale, the majority has added that the family court should have pursued whether mother intended to alienate father from the child through her allegations.

One can find pieces of the majority's rationale in the family court decision, but not in the way the majority has put them together. For example, the family court rejected mother's allegations that father abused her and misused drugs and speculated that she might have made such accusations to minimize his role in the child's life. It never suggested that the mother was trying to alienate the child from the father. Indeed, it found that the parents had successfully co-parented in the past and tried hard to induce them to develop a new co-parenting arrangement. This case is a far cry from *Renaud v. Renaud*, 168 Vt. 306, 309, 721 A.2d 463, 465 (1998), in which the family court expressly found that "mother had undermined the child's relationship with father by filing excessive and baseless abuse allegations." We are not faithful to the limited standard of review if we construe the family court decision in a way to make it least defensible.

If the family court made any mistake here to induce the majority's response, it was a labeling mistake. The family court's rationale better fits factor three, 15 V.S.A. § 665(b)(3), or an independent factor, than factor five, *id.* § 665(b)(5). Under the proper standard of review, a labeling mistake does not justify the majority's response of creating a new and indefensible analysis.

We do, I believe, have to address directly the argument that father did make on appeal — that the family court rendered its decision based on the interests of the mother, rather than the interests of the child. I again stress that this is an exceptional case. The parties, who never expected to marry, planned this child to fill a void in mother's life caused by the death of another child. Thus, in explaining its rationale, the family court stressed the effect an adverse custody decision would have on the mother. If the court had gone no further, I would agree with appellant father that we could not affirm the court's conclusion.

But the family court did go further and relate the mother's loss to the effect on the child. Essentially, the court concluded that making the father the primary custodian would have such an effect on the mother that it would destroy her ability to be an effective parent, adversely affecting the child. It concluded that the reverse custody situation would not have this effect. Its reasoning is focused primarily on the effect of its decision on the best interests of the child. In these circumstances, I would affirm the family court's conclusion as consistent with the statutory mandate of § 665(b) under our deferential standard of review.

### III. Reevaluation of the Relevant Factors

It is impossible to read the trial court and majority decisions in *Spaulding v. Butler* without concluding that these decisions simply give different weight to the various factors bearing on custody and, as a result, reach different conclusions. This would be entirely understandable and healthy if the decisions came from two different trial judges. It is not appropriate if one of the decisions comes from an appellate court purportedly issued under a limited standard of review.

In two respects, the circumstances of *Spaulding*, and the family court decision, make it more likely that this Court will abandon its limited role and decide the case de novo. First, the family court faced a choice between two flawed parents. For either, it is easy to state why that parent should not be a primary custodian; it is far harder to find and weigh positive skills and conduct which warrant confidence that a child in that parent's custody will have positive and nurturing parenting in a safe and secure environment. Unfortunately, there is no third option; the trial judge was forced to make a disquieting and unpleasant choice, almost on the basis of the least damage to the child.

Second, the trial judge, to her credit, did not sugarcoat the negative history, skills, characteristics or motives of either parent. I say "to her credit" because the decision reinforces that the court had no illusions

that it could assure the child a good home and that the court struggled to find the best result. But that result has become harder to affirm because the flaws of the custodial parent, as explicitly contained in the findings, are so difficult to accept.

Indeed, on the surface, it appears much easier to accept the majority analysis because it details the father's flaws and largely ignores, or explains, the mother's flaws. In a truncated fashion, the majority quotes the family court's analysis of the mother's flaws *in its decision on whether there were changed circumstances* and then largely ignores that analysis in looking at the best interest of the child. Let me repeat, in full version, what the family court found about the negative factors bearing on the mother as a custodian:

> Specifically, during [the] time [between September 1994 and April 1997] there was a pattern of poor care of a severe and painful diaper rash, the severity of which was unnecessary as shown by the improvement in the rash during the weekend visitations with Mr. Spaulding; a pattern of Nathan appearing for visits with Mr. Spaulding with a number of bruises and marks on his body; a lead test indicating lead poisoning of Nathan with no information that the problem had been taken care of; a pattern of biting behavior between Michael and Nathan that had not improved despite the work of Ms. Butler with Meredith McCartney in therapy; delays in Nathan's developmental milestones as indicated by testing through Triple E and Stepping Stones; and severe bite marks on Nathan from Michael on April 11, 1997. . . . [The evidence] shows a child living in an environment with a pattern of neglect sufficient to result in measurable developmental delays and physical injuries. The change is substantial in that it resulted in Nathan lagging behind in his development and suffering painful personal injury despite remedial efforts. It is unanticipated in that one would never expect parental care to result in such an impact on a child.

Thus, the family court was forced to choose between a parent who exhibited "a pattern of neglect sufficient to result in measurable developmental delays and physical injuries" and a parent who had a history of abuse and attempts to alienate the child from the other parent, at best an unenviable choice.

Where the trial court decision is candid and balanced about the nature and difficulty of this choice, I cannot say the same about the

majority decision here. It builds to its ultimate conclusion that the family court could not find *within its discretion* that it was in the child's best interest to award custody to a father who "was a batterer, a liar, and . . . [who] consciously and deliberately alienated Nathan from mother." 172 Vt. at 481, 782 A.2d at 1178. The equivalent criticism of the majority is that it cannot find *as a matter of law* that custody must be awarded to a mother who, when she had custody, engaged in "a pattern of neglect sufficient to result in measurable development delays and physical injuries." I think we trivialize the difficulty and complexity of child custody adjudication with this kind of analysis.

The essence of this dissent is that the kind of difficult choice presented by *Spaulding* must be made by the judge who heard the evidence and viewed the parents as they testified and otherwise participated in the merits hearing. To the extent we have an appellate role, we should exercise it sparingly, and not as we are doing here, to second-guess the considered choice of the family court judge and substitute our own judgment. Because that is the fundamental point of the dissent and captures what I believe is wrong in the majority decision in *Spaulding*, I will not belabor my specific disagreements with that decision beyond three additional points.

I do not understand the remand in this case, other than for the evaluation of changed circumstances. The Court has said that the family court could not reach the decision it did based on its findings and that the findings are supported by the evidence. Under that analysis, the family court has no choice but to award custody to the mother. To the extent the majority is trying to suggest that it did anything other than substituting its judgment for the trial judge, that suggestion is illusory. Indeed, the worst outcome we could have for the child is further extensive litigation to reopen the findings and conclusions of the family court.

A good deal of the majority's analysis is based on its conclusion that any risk that the child would be unsafe if placed with the mother "is speculative at best." *Id.* at 481, 782 A.2d at 1178. I can describe that conclusion only as incredible. The family court detailed the past harm to the child while in mother's custody and concluded that there had been "a pattern of neglect sufficient to result in . . . physical injuries." How is it speculative that the identical pattern will reoccur when custody is again transferred to the mother?

Third, we need to be careful in how we define parental alienation and in administering a rule that a parent cannot benefit from

alienating a child from the other parent. No parent who believes that the other parent is the cause of physical, sexual or extreme emotional abuse of the child is promoting contact between the child and that parent. The family court justifiably criticized the father for being too quick to go to the police, SRS or the courts, but some of father's allegations of abuse were confirmed in earlier court proceedings and formed the basis of the abuse prevention order transferring custody to father and limiting mother to supervised visitation. Unless the majority is prepared to say that father somehow defrauded the family court, a conclusion with no support in the findings, it is inappropriate to call a court-ordered custody situation a "successful attempt[] at alienation." *Id.* at 480, 782 A.2d at 1177.

In conclusion, I believe that in both *Spaulding* and *Cloutier* the majority has embarked on the pursuit of a more just and correct custody determination that will injure the exact children it is attempting to protect. If we actually accorded the family court "broad discretion in determining the best interests of the child," as both decisions state we do, the only consistent conclusion would be to affirm the custody decisions in both cases. Reluctantly, I must dissent from the reversals in both cases.

I am authorized to state that Justice Morse joins in this dissent.