**Ray R. Johnson v. Valerie J. Johnson**

[659 A.2d 1149]

No. 94-146

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed April 14, 1995

*William G. Congleton*, Essex Junction, for Plaintiff-Appellee.

*Paul D. Jarvis* of *Jarvis and Kaplan*, Burlington, for Defendant-Appellant.

**Morse, J.** Defendant Valerie Johnson appeals a divorce judgment, arguing that the family court abused its discretion by (1) giving plaintiff Ray Johnson sole parental rights and responsibilities of the parties' seven-year-old daughter, (2) allowing the child's guardian ad litem (GAL) to testify in violation of V.R.F.P. 7, and (3) awarding her one-half the equity in the marital home to be paid in twelve years without any provision for interest on account of the delay in payment. We reverse.

The parties had been married approximately six years when in July 1993 the father moved out of the marital home and into his parents' home. At the temporary hearing in September 1993, the court placed Caila in the care of her mother, who had been the child's primary caregiver during the marriage. Following the final hearing in February 1994, however, the court awarded the father parental rights and responsibilities and granted the mother liberal parent-child contact. The court also awarded the father the marital home, subject to a second mortgage held by the mother in the amount of $6000 — one-half the equity that had accrued to that point — to be paid off

when Caila turned eighteen or the house was sold, whichever occurred sooner. There was no provision for interest.

The mother argues that the court abused its discretion in awarding the father parental rights and responsibilities. She contends that instead of giving great weight to her role as the child's primary caregiver, the court improperly relied on the role of the father's mother, who provided much of Caila's day-to-day care when the child was with the father, and on a statement made by the GAL. She further contends that the court failed to make adequate findings on whether she was an unfit parent, and whether taking Caila away from her, the primary caregiver, would have a detrimental effect on the child.

For the most part, this case pitted the testimony of the father and his family against the testimony of the mother and her family. The father testified that the mother slapped him after the parties missed each other during an attempted visitation drop-off. The father's sister testified that three years earlier, shortly after the parties' first separation, the mother threw a plant stand at her after arguing with the father. The father's mother testified that on another occasion the mother had kicked Caila in the ankle after Caila kicked the mother to get her attention. The father's brother, who conceded on cross-examination that he had not been around the mother for some time, reported that he had seen the mother pinch Caila for pinching another child.

For her part, the mother suggested that some of her behavior could be attributed to her breakup with the father and to bouts of depression that had long since ended. She testified that she had been on medication for post-partum depression and anxiety between 1987 and 1990 — due in part to a lack of support from the father — but that she had not needed the medication for several years. Two of the mother's family members testified that she was a good mother who handled her daughter well.

The "wild card" in this case was the father's testimony that the mother told him that members of her family, including a brother who had recently moved into the marital home with her and Caila, had sexually abused her as a child. The testimony regarding this potentially crucial issue was extremely limited. The father did not indicate when the mother had told him of the abuse or provide any specific information concerning the nature of the abuse or when it allegedly occurred. The mother denied that her father and brothers had abused her and denied ever having told the father such a thing. She stated

that her brother was temporarily residing with her and Caila because he was out of work. The court's findings suggest that the judge was not sure the abuse actually occurred, but believed the father's testimony that the mother had told him she was abused.

Beyond the testimony noted above, there was no evidence that the mother was an unfit mother or that Caila's development was languishing. The witnesses generally agreed that both parents loved Caila. The father's mother testified that Caila was doing better in school. The mother testified that she had been in regular contact with school officials and had enrolled Caila in a program designed to help children of divorced parents cope with their loss. The father's family testified that the father spent much of his free time with Caila, but there was little evidence on his involvement in her schooling or other activities. There was no testimony from counselors or other independent sources regarding Caila's progress in school or her emotional attachment to either her father or her mother. In short, evidence on how Caila would be affected by a transfer of custody was sparse.

█ In making its decision regarding parental rights and responsibilities, the court was faced with accusations against the mother that were based, for the most part, on testimony concerning only a few isolated incidents. The court had to weigh this testimony, while keeping in mind the significance generally accorded to the role of the primary caregiver. See *Harris v. Harris*, 149 Vt. 410, 418, 546 A.2d 208, 214 (1988). The exact weight of the primary-caregiver factor depends on the quality of the relationship between the child and the custodian and on the likely effect the change of custodian would have on the child and the family. *Id.* at 418-19, 546 A.2d at 214; see *Harris v. Harris*, 162 Vt. 174, 178, 647 A.2d 309, 312 (1994). Absent evidence on the likely effect of the change of custodian, "the court should ordinarily find that the child should remain with the primary custodian if that parent is fit." *Harris*, 149 Vt. at 419, 546 A.2d at 214.

█ Of course, the court also had to consider evidence regarding the father's relationship with and ability to care for his daughter. A parent may not "claim the benefit of a statutory factor solely by showing that the other parent's actual or expected performance with respect to that factor is inadequate." *Id.* at 418, 546 A.2d at 214. Rather, parents must present evidence regarding their relationship with the child in light of the relevant statutory factors. *Id.* As indicated above, there was very little evidence regarding the father's relationship with his daughter, other than testimony from his family

that he spent a lot of his free time with Caila and had not missed any parent-child contact days granted him under the temporary order.

Here, the court recognized that the mother had been Caila's primary caregiver, but stated that it had "some question as to the adequacy of the care she has provided and her fitness as a parent." The court explained, as follows:

> She is violent and unstable and has used inappropriate punishment on Caila. The court is also concerned about the presence of Defendant's brother in her household. Either the [mother] lied to the [father] about the sexually abusive relationship she had with her brother and father or she lied to the Court about its non-existence. In either case, such duplicity is disturbing. It would be particularly disturbing if the brother had abused the [mother] and is now residing with her and Caila while the [mother] is in denial that such abuse occurred. Further, the [mother] is unable to communicate with the [father] about important events in Caila's life and is unable to refrain from violence against him.

The court's finding that the mother did not communicate with the father about important events in Caila's life is supported primarily by the mother's admission that shortly after the father left her she took Caila to Massachusetts for a week without informing the father of their whereabouts. The father also testified that on one occasion the mother did not inform him that Caila had become so sick that she had to go the hospital, but the mother testified that the father knew Caila was sick and that she took the child to the hospital merely to have a test done.

Regarding Caila's future under her father's care, the court found that the father (1) had been a loving parent who would provide a stable and nurturing environment for Caila; (2) had spent much of his free time with his daughter throughout her life and since the parties' separation; and (3) had demonstrated a commitment to provide for Caila's physical and emotional needs. The court also noted that the father's extended family was involved in Caila's life in a positive and supportive manner. The court recognized that the father's mother had done much of the meal preparation and laundry when Caila visited her father, but found that the father had the ability to perform these chores himself.

Reviewing the record in this case, we express our concern at the outset that the parties' evidence and the court's findings and

conclusions focused more on a few negative incidents involving the mother than on the general parenting skills of the parties and the likely effect a transfer of custody would have on Caila. We recognize that the court was limited by the evidence presented to it and that the testimony regarding the mother's conduct on a few occasions had at least some relevance to determining the quality of her parenting skills, but evidence concerning each parent's day-to-day relationship with the child would be far more relevant. We encourage the family court to use its authority to order home studies under V.R.F.P. 5, and to control the direction of the testimony in custody matters to obtain the most relevant evidence. See V.R.E. 611(a) (court shall exercise reasonable control over mode and order of interrogating witnesses and presenting evidence so as to better ascertain truth).

██ Ordinarily, given the wide discretion the court has in custody matters to determine the credibility of witnesses and the weight of evidence, we would affirm the family court's custody decision when it compares the attributes of each parent in light of the factors enumerated in 15 V.S.A. § 665(b), and does not rely solely on a showing that one parent's actual or expected performance was inadequate with respect to one factor. *Harris*, 149 Vt. at 418, 546 A.2d at 214; see *Bissonette v. Gambrel*, 152 Vt. 67, 69-70, 564 A.2d 600, 601 (1989) (trial judge has broad discretion in determining what is in best interests of child, and may rely on common sense and experience in reaching reasoned judgment); *Bonanno v. Bonanno*, 148 Vt. 248, 250-51, 531 A.2d 602, 603 (1987) (appellate court must give due regard to trial court's unique position to assess credibility of witnesses and weight of evidence; if court's findings are supported by evidence and may be reasonably read to support judgment, they are controlling). That procedure was not followed here, however. There was no even-handed analysis of the § 665(b) factors by the trial court with respect to each parent, and there was very little evidence to support the court's findings regarding the father's ability to provide for his daughter's physical and emotional needs.

 Further, the mother argues, and we agree, that the court erred by allowing the GAL to make a statement regarding facts outside the record, in violation of V.R.F.P. 7(d). Rule 7(d) permits a court-assigned GAL to state "a position" but requires that the reasons for the position be "based upon the evidence in the record." When necessary, a GAL may testify as a witness, in which case opposing parties would have an opportunity to probe the GAL's

rationale behind the recommendation given to the court. V.R.F.P. 7(d) (GAL may be called as witness only when testimony would be directly probative of child's best interest, and no other person could be employed or subpoenaed to testify on same subject matter). Although here the family court did not intend to allow the GAL to testify as a witness, it allowed her, over the mother's objection, to make a statement based on evidence outside the record, without giving either party an opportunity to question her.

It is not surprising, given the lack of neutral witnesses, that the court wanted to hear what the guardian had to say. At the end of the final hearing, the court asked the GAL if she had an opinion on what the court should do. Over the mother's objection, the GAL stated that (1) she had met with school officials, who spoke highly of the father; (2) the father handled Caila "very nicely" one Sunday when the GAL met him and Caila at a restaurant; and (3) she had been unable to reach the mother in the evenings despite several attempted calls, and the mother was not willing to receive calls at work. The GAL concluded that the father "would do very well with his daughter" because he is an "even-tempered, quiet-spoken person, and I have been in school observing to see."

The family court's decision makes no mention of the GAL's recommendation, but the GAL had the last word in a closely contested case in which the court decided not to award parental rights and responsibilities to the child's primary caregiver. Further, the court specifically stated that it wanted to hear what the GAL had to say, despite the mother's objection. Because we cannot determine the impact of the GAL's recommendation on the court, and given the close state of the evidence as detailed above, we reverse the court's determination on parental rights and responsibilities and remand the case for a new hearing. Cf. *Lillie v. United States*, 953 F.2d 1188, 1192 (10th Cir. 1992) (in nonjury trial, erroneous admission of evidence is harmless only if other competent evidence is sufficiently strong to permit conclusion that improper evidence had no effect on decision).

■ The mother also challenges the court's property division, arguing that it was inequitable for the court to award her half the current equity in the marital home, to be paid approximately ten or eleven years later without any provision for interest. We agree. See *Williams v. Williams*, 158 Vt. 574, 578, 613 A.2d 200, 202 (1992) (trial court abused its discretion in awarding $25,000 lien on marital home

for period up to fourteen years without some protection against inflation). Accordingly, the court's property division must be reversed.

*Apart from the decree of divorce, the family court's February 11, 1994 order is reversed, and the case is remanded for a new hearing.*