## Jo-Anne M. GUIEL v. James J. GUIEL

[682 A.2d 957]

No. 95-371

July 2, 1996. Both parties appeal from the final judgment of the family court in this divorce case. Wife appeals the court's decision awarding parental rights and responsibilities for the couple's teenaged son, Scott, to husband. Husband appeals from the court's property division and maintenance awards. We affirm.[1]

The parties married in 1972, and adopted a son, Scott, shortly thereafter. During the marriage, wife worked as a homemaker and also worked part-time in the fields of special education and geriatric care. She has worked sporadically at part-time jobs since the parties separated in 1993, but has medical problems that prevent full-time employment. Husband works for an insurance company as a claims adjuster, earning approximately $65,000 a year. Following the separation, Scott lived for a time with his mother in the family home. In September 1994, however, the family court issued a temporary placement order awarding legal and physical parental rights and responsibilities to husband. This order was a response to an unpleasant incident between the parties at the hospital to which Scott was taken following an automobile accident.

Wife argues that the family court's parental-rights-and-responsibilities order should be reversed because the court failed to consider her role as Scott's primary caretaker. Although recognizing that the family court has "broad discretion in custody matters," *Nickerson v. Nickerson*, 158 Vt. 85, 88, 605 A.2d 1331,

1333 (1992), wife maintains that the court abused its discretion by focusing on "isolated incidences" and disregarding wife's role as primary caretaker and her overall parenting skills.

We note first that 15 V.S.A. § 665(b)(6) requires the court to consider as one factor in parental-rights-and-responsibilities determinations "the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development." As Scott was sixteen at the time of the final hearing, and had been living with his father for several months, the court may have reasonably concluded that his relationship with the primary care provider was not a particularly important factor in the custody decision. Indeed, the court apparently gave great weight to Scott's own wishes, noting that Scott was "particularly mature given his age" and "should have significant influence over his own life."

Moreover, the court found that returning to live with his mother would be "too unsettling" for Scott and that wife's significant medical problems, which have "affected her ability to cope with the pressures of daily life," would make it difficult for her to deal with a teenager. The court therefore did consider "the likely effect the change of custodian would have on the child and the family," *Johnson v. Johnson*, 163 Vt. 491, 494, 659 A.2d 1149, 1151 (1995), and found that Scott would be "negatively affected" by living with his mother. These findings are supported by the evidence, and suggest that Scott's best interests are served by remaining with his father. There was no abuse of discretion.

Husband appeals the family court's property division and maintenance orders. The court ordered that the parties' assets be divided roughly equally, and that husband pay wife permanent maintenance in an amount sufficient to equalize the parties' incomes. Again, this is an area in which the family court has broad

---

[1] The Chief Justice sat for oral argument in this case but did not participate in the decision.

discretion. *Klein v. Klein*, 150 Vt. 466, 468, 555 A.2d 382, 384 (1988). The court's decision will be upheld unless it "fails to exercise its discretion or exercises it for clearly untenable reasons or to an untenable extent." *Id.* at 468-69, 555 A.2d at 384.

With respect to the maintenance award, husband argues that the court erroneously based the award "only upon the single criterion of the payor's income." *Delozier v. Delozier*, 161 Vt. 377, 385, 640 A.2d 55, 59 (1994). We do not agree with this characterization of the family court's decision. The court stated that the basis for the maintenance award was the length of the marriage (twenty-three years) and the fact that wife is middle-aged, in poor health, and unable to work full-time. These are the kinds of factors that we identified in *Delozier* as supporting permanent equalization of incomes. *Id.* at 386, 640 A.2d at 59. The court determined that the award would permit wife to find suitable housing, take classes to prepare her for employment, and meet her reasonable personal needs. It also noted that the award would not reduce her incentive to work, because she would need to increase her income to attain the standard of living she enjoyed before the divorce. See *id.* at 385 n.*, 640 A.2d at 59 n.*. Given the parties' circumstances, the court did not abuse its discretion in making the permanent maintenance award.[2]

Finally, husband argues that the family court's findings do not support its property division order. In *Dreves v. Dreves*, 160 Vt. 330, 628 A.2d 558 (1993), we stated that, to withstand appellate review, findings made in support of property division determinations must "'provide a clear statement as to what was decided and why.'" *Id.* at 333, 628 A.2d at 560 (quoting *Richard v. Richard*, 146 Vt. 286, 287, 501 A.2d 1190, 1190 (1985)). Here, the family court explained its decision in great detail, meeting its obligation to explain the property division. Husband points to two specific issues: first, that although wife was reimbursed for her credit card debt accrued during the separation, he was not reimbursed for monies spent to maintain the family home during that time, and second, that the court did not fairly apportion wife's interests in two personal injury actions. In both instances, the court acted well within its discretion. The court found that the personal injury actions were too speculative to assign a monetary value, but nonetheless assigned husband a twenty-five percent interest in the actions. (The court also assigned wife a twenty-five percent interest in husband's personal injury action.)

With respect to wife's credit card debt, the court found that much of the debt was for medical expenses, a significant portion of which was reimbursable by insurance. The court also found that husband had cashed two insurance checks totaling $3180 that should have been applied to wife's medical expenses. Finally, although the court did not reimburse husband for certain expenses relating to the family home, neither did the court reimburse wife for her expenses preparing the home

_____

[2] Husband's concern that the maintenance award does not take into account that he is the custodian of the parties' son appears unfounded. The court made clear in its order clarifying and amending the final judgment that the magistrate's child support determination would reflect the parties' equalization of income.

At oral argument, new counsel for husband raised issues relating to calculation and taxation of the maintenance award that were not briefed. Arguments raised for the first time at oral argument will not

_____

be considered by the Court. See *Smith v. Smith*, 139 Vt. 234, 236, 427 A.2d 378, 380 (1981) (issues not raised in appellate brief are waived), *overruled on other grounds by Cliche v. Cliche*, 143 Vt. 301, 466 A.2d 314 (1983).

for sale. That wife was reimbursed for some living expenses when her credit card debt was paid may mean that the property division was not precisely equal, but property division is not an exact science. "The distribution must be equitable, not necessarily equal." *Myott v. Myott*, 149 Vt. 573, 579, 547 A.2d 1336, 1340 (1988). As we concluded in *Myott*, the "split here is not so unequal that it shows an abuse of discretion." *Id.*

*Affirmed.*

**Dooley, J.,** dissenting. I agree with the Court's decision on parental rights and responsibilities and the division of property. I do not agree that a maintenance award providing a permanent equalization of income is appropriate in this case and, accordingly, dissent from the affirmance of the maintenance award.

The main relevant precedent is *Delozier v. Delozier*, 161 Vt. 377, 640 A.2d 55 (1994), where we reversed a maintenance order virtually identical to that imposed here. We started by noting that "courts have not favored the use of formulas for determining maintenance awards" because "in effect, they modify support payments without regard for modification standards" and "are not responsive to the needs of the parties, and therefore have the effect of either punishing the payor spouse or shortchanging the recipient spouse." *Id.* at 384, 640 A.2d at 58, 59. In spite of these criticisms, we held that income equalization awards "may be acceptable when they equalize the parties' financial status for an appropriate period of time." *Id.* at 385, 640 A.2d at 59. On this point, we have recently upheld a one-year equalization award, distinguishing *Delozier* because there was no risk that, as in *Delozier*, the income equalization would become punitive rather than compensatory. See *Clapp v. Clapp*, 163 Vt. 15, 21, 653 A.2d 72, 75 (1994).

On the facts of the specific case, we found in *Delozier* that numerous factors warranted a permanent maintenance award: the length of the marriage bordered on long term; the parties established a fairly high standing of living during the marriage; the wife gave up career advancement to enhance the husband's medical career during the marriage; and the wife had custody of a young child with special needs and as a result continued to face limited employment opportunities. Nevertheless, we concluded that the court abused its discretion in awarding maintenance based on permanent equalization of after-tax incomes. We found the award *"far* too speculative with respect to satisfying the relevant statutory criteria and addressing the purposes of maintenance." *Delozier,* 161 Vt. at 386, 640 A.2d at 60 (emphasis supplied). In the language relied upon by the trial court and the majority, we distinguished when permanent income equalization might be appropriate:

> Although the permanent equalization of incomes may be appropriate in long-term marriages when the recipient spouse is past middle age or in poor health, that was not the case here. This is a borderline long-term marriage, but plaintiff is relatively young, in good health, and will be able to work as an RN within the next few years. The parties may be employed for a period of time well beyond the length of the marriage. Thus, the permanent equalization of the parties' income may wind up being punitive rather than compensatory.

*Id.*

The majority holds that permanent equalization is appropriate here because the marriage is long-term and plaintiff is middle-aged and in poor health. In fact, the differences between this case and

*Delozier* are differences of degree not kind, and plaintiff's claim for permanent income equalization is weaker than that of the plaintiff in *Clapp*, where we characterized the facts as "somewhat similar" to those in *Delozier*. Unless *Delozier* represents a case factually on the borderline, a characterization difficult to reconcile with our statement that the facts were "far too speculative to satisfy the statutory criteria and purposes of maintenance," the rationale of *Delozier* requires us to reverse this order also.

The trial court particularly stressed plaintiff's health problems, which result from three automobile accidents. It found, however, that she was making a recovery and would make a substantial recovery in one to two years. She is college-educated and is taking classes that qualify her in human services so she should be able to gain the education to start in that field within two years. In many ways, plaintiff's situation is similar to that of the plaintiff in *Delozier*, whose employment opportunities were limited by her need to take care of a young child with special needs. In both cases, it is likely that the parties will be employed for a period well beyond the length of the marriage and permanent equalization may wind up being "punitive rather than compensatory."

This marriage was longer than in *Delozier* (23 years rather than 14) and plaintiff is older (45 years rather than 39), but there are virtually no findings to support a compensatory component of maintenance based on the "role of the recipient spouse during the marriage." *Id.* at 382, 640 A.2d at 58. As in *Delozier*, it is likely that the parties' situation will change markedly over the many years this award will be in effect and the resulting income distributions will have little relation to the statutory criteria and purposes of maintenance. As in *Delozier*, despite the majority's conclusion to the contrary, the award will reduce plaintiff's

"incentive to make or increase [her] income at a time when it is desirable that she reach her full employment potential." *Id.* at 385 n.*, 640 A.2d at 59 n.*. It will also reduce defendant's incentive to increase his earnings because half of the increase will go to plaintiff.

It is unnecessarily difficult for us to determine where to draw the *Delozier* lines because we have failed to define the "purposes of maintenance" referenced in the opinion. Although many formulations are possible, the best is contained in an article authored by our judicial colleagues from Maine. See J. Sheldon & N. Mills, *In Search of a Theory of Alimony*, 45 Me. L. Rev. 283, 285 (1993). They conclude: "As it is presently understood, the purpose of [maintenance] is the prevention of unfairness by forcing ex-spouses to share all of the economic gains and losses that have been produced by the marriage but that are realized *after* the divorce." *Id.* Maintenance is not a post-divorce income-maintenance program to meet all spousal need, however and whenever it arises.

The purpose of maintenance requires a substantial, permanent maintenance award in this case because the post-divorce economic situation of the parties is greatly influenced by economic investments and gains made during the marriage. See, e.g., *Klein v. Klein*, 150 Vt. 466, 473-75, 555 A.2d 382, 386-88 (1988). This order, however, goes well beyond the purpose. It makes these parties permanent and involuntary economic partners despite their desire to divorce and get on with their separate lives and despite the fact that much of their economic future will be determined by their own future actions. As *Delozier* holds, there are cases where a permanent income partnership is justified because the income will be determined by gains and losses produced within the marriage. If plaintiff were so ill or so old that she had no meaningful economic opportunity, the order would be justified. This case does not fit within those limited circumstances.

I recognize that we need a method to allocate future income between pre-divorce and post-divorce causes. As an example, two feminist commentators have suggested a starting point that income should be equalized for a period equal to half the length of the marriage. See J. Williams, *Is Coverture Dead? Beyond a New Theory of Alimony*, 82 Geo. L.J. 2227, 2261 (1994); J. Singer, *Alimony and Efficiency: The Gendered Costs and Benefits of the Economic Justification for Alimony*, 82 Geo. L.J. 2423, 2455 n.136 (1994). However we make the allocation, it is important we do so rather than continuing to endorse the permanent economic partnership this order reflects.

I dissent.