2007 VT 69

## Paul Velardo v. Sarah Ovitt

[933 A.2d 227]

No. 06-184

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed July 27, 2007

*Nanci A. Smith*, Montpelier, and *Richard L. Ducote*, Pittsburgh, Pennsylvania, for Plaintiff-Appellant.

*Nicholas L. Hadden* and *Scott R. Bortzfield* of *Law Office of Nicholas Hadden*, St. Albans, for Defendant-Appellee.

¶ 1. **Dooley, J.** This is a custody dispute over a seven-year-old child. Father appeals the family court's award of legal rights and responsibilities over the child to mother asserting, among other claims, that he is entitled to a new trial because an assistant judge who sat in the case is the sister of the guardian ad litem (GAL), and the relationship was not revealed until after trial. We hold that the undisclosed sibling relationship between the assistant judge and the GAL required recusal of the assistant judge pursuant to Canon 3E(1) of the Code of Judicial Conduct. As a remedy for the litigants, we find that, under the circumstances, we must vacate the family court's order and remand for a new trial.[1] In the interests of judicial economy, however, we address

---

[1] We address only what is necessary for purposes of father's appeal of the family court's order in this case. Thus, although we find a violation of the Code as a matter of law, we do not address the issue of disciplinary consequences, if any. See *Liljeberg v. Health Servs. Aquisition Corp.*, 486 U.S. 847, 862 (1988) (finding, as matter of law, violation of federal statute controlling judicial conduct, but addressing only remedy for litigants, not discipline). Unlike a disciplinary hearing, the assistant judge is not a party to this appeal. It is for the Judicial Conduct Board to independently decide in the first instance, in any disciplinary proceedings that may occur, whether there was a violation and what sanction, if any, should be imposed. *In re Hill*, 152 Vt. 548, 555, 568 A.2d 361, 365 (1989) (per curiam) (stating that this Court's constitutional responsibility for judicial and attorney discipline "is

one other of father's claims because it is likely to reappear in subsequent proceedings.

¶ 2. Father filed a parentage action in August 2003, shortly after he left the parties' home, seeking custody of the parties' then four-year-old son. The State also brought a CHINS action (child in need of care or supervision) that same month. Father made numerous allegations that mother had abused the child. The parties reconciled in February 2004, but by December of that year they were again in litigation over the child. The presiding family court judge appointed Mary Connor to serve as GAL for the child on March 7, 2005. She submitted a brief report to the court dated July 9, 2005. In it, she noted twice that "[e]very report of child abuse was followed up by [mother] bringing her son . . . to be seen by [the child's doctor] to rule out abuse." She recommended, consistent with a previous order of the court, that father be awarded only supervised visitation.

¶ 3. In the course of the litigation, the parties stipulated that Jan Tyler, Ph.D., would conduct a forensic evaluation of the child. She completed her report in January 2004 and recommended that mother be awarded primary physical and legal responsibility for the child. Father's counsel at the time agreed to admit the report. Later, however, father's new counsel objected to its admission on the ground that it contained impermissible hearsay.

¶ 4. In October 2005, the family court issued a thirty-one-page decision giving mother sole legal and physical custody of the child and providing for supervised visitation by father. The decision was signed by the presiding judge and Assistant Judge Teresa Manahan. It was based on evidence presented in eight separate hearings. The court noted the presence and written recommendation of the GAL in one sentence at the beginning of its order. The court also chronicled each audio, video, and photographic record of the child taken by father and his parents. It found that each party could provide the child with "a safe environment," but found that, although father "clearly was the primary care provider for the child while the parties lived together," there were countervailing "problems created by his continuing need to interrogate the child" about mother's alleged abuse. The court noted, on the other hand, mother's "insight" and "appropriate concern and responsibility for

---

carried out in the first instance through the Judicial Conduct Board, established by Rule 4 of the Rules of Supreme Court for Disciplinary Control of Judges").

the child" as shown through her continued cooperation in the investigation of the child's welfare. In light of these differences, the court awarded mother sole legal rights and responsibilities and awarded father parent-child contact to be "supervised by responsible adults as agreed by the parties."

¶ 5. Father subsequently moved for a disqualification of the judges and for a new trial because of the post-trial revelation that the GAL and Assistant Judge Manahan are sisters, and because Judge Manahan participated in the custody decision. Judge Manahan did not respond to the motion. The GAL did respond, acknowledging that she is the sister of Judge Manahan, but stating that she had no ex parte communications with the judge. The presiding judge did not rule on the motion for a new trial and referred the disqualification motion to the administrative judge. The administrative judge declined to disqualify Judge Manahan because there was nothing pending before her at that time and declined to disqualify the presiding judge because any claims he was "contaminated" based on his contact with the assistant judge were speculative. Father also requested a new trial based on the family court's consideration of the Tyler report; the court denied this motion. On appeal, father contests the denial of these motions, as well as the administrative judge's denial of his post-trial request to remove the assistant and presiding judges from the case. We address the remedy for the assistant judge's alleged ethical violation first, and proceed briefly to father's other claims.

¶ 6. The paramount aim of our Code of Judicial Conduct is to promote public confidence in our judiciary. Such public confidence is an essential element of any properly functioning legal system. As the first words of the Vermont Code of Judicial Conduct state:

> *Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system.*

A.O. 10, Preamble. To ensure the judicial independence and public trust on which our legal system is based, judges are subject to

strict standards of conduct. They are required to recuse themselves from sitting on a case where their "impartiality might reasonably be questioned." *Id.* Canon 3E(1). In this case, we are required to determine whether this standard was violated, and if so, whether the parties are entitled to a particular remedy.

¶ 7. The Code is binding on "anyone, whether or not a lawyer, who is an officer of the judicial system and who performs judicial functions." A.O. 10, Terminology [11] (defining "judge"). Unquestionably, this includes assistant judges. *In re Kroger*, 167 Vt. 1, 5-6, 702 A.2d 64, 67 (1997) (per curiam) (applying A.O. 10, Canons 1 and 2A to assistant judge); *State v. Hunt*, 150 Vt. 483, 492, 555 A.2d 369, 375 (1988) (applying A.O. 10, Canon 3 to assistant judges). Canon 3E, formerly Canon 3C, controls the disqualification of judges. It states in no uncertain terms that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality *might reasonably be questioned.*" A.O. 10, Canon 3E(1) (emphasis added). It then gives a nonexhaustive list of instances in which recusal is required. *Id.* One such instance is when "a person within the fourth degree of relationship" to the judge "is a party to the proceeding, or an officer, director or trustee of a party," is "acting as a lawyer" in the proceeding, or "is to the judge's knowledge likely to be a material witness in the proceeding." *Id.* Canon 3E(1)(d)(i), (ii), (iv). It is undisputed that, as sisters, the assistant judge and GAL were related within four degrees. See A.O. 10, Terminology [9] (defining "fourth degree of relationship" as including sisters).

¶ 8. Both the assistant judge and the GAL had significant, but limited, roles in this custody case. Thus, the first question is whether Canon 3E(1) requires recusal of an assistant judge if a GAL is within the fourth degree of relationship to the judge. The assistant judge is a unique Vermont judicial officer who is elected at the county level and is also responsible for "care and superintendence of county property," as well as other county administrative responsibilities. 24 V.S.A. § 131; see also *id.* §§ 133, 171, 211. Assistant judges are elected in each county. Vt. Const. ch. II, § 50. For purposes of many family court proceedings — including a parentage action such as the one here, 4 V.S.A. § 454(1) — the court consists of the presiding judge plus the available assistant judge or judges. *Id.* § 452(a). In such cases, the full court decides questions of fact, and the presiding judge decides questions of law and mixed questions of fact and law. See

*id.* § 457(b). A custody determination is a mixed decision of fact and law. See *Woodbury v. Woodbury*, 161 Vt. 628, 628-29, 641 A.2d 367, 367 (1994) (mem.) (explaining that assistant judges may not award custody but that "the presiding judge must make the custody determination based on the findings of fact of the court, which include the findings of fact of the assistant judges"). Thus, even though Assistant Judge Manahan signed the custody determination in this case, that signature must be taken to represent approval of the factual findings only.

¶ 9. Nevertheless, although the assistant judge's role is more limited than that of the presiding judge, we see no reason why that limitation affects the application of Canon 3E(1), at least in a proceeding that resolves factual issues. Thus, an assistant judge must recuse herself under the same circumstances as a presiding judge. We held exactly as much in *Richard v. Richard*, in which we required the disqualification of assistant judges consistent with Canon 3. 146 Vt. 286, 288, 501 A.2d 1190, 1191 (1985), *superseded on other grounds by* V.R.C.P. 40(e).

¶ 10. The coverage of the GAL in Canon 3E is more complicated. As discussed above, the Canon specifically mentions parties, lawyers, and expected witnesses, but does not list GALs by name. A GAL may be appointed in a parentage proceeding where the "determination of parental rights and responsibilities is a substantial issue." V.R.F.P. 7(c). A GAL is appointed by the court to be "an independent parental advisor and advocate" who "safeguard[s] the child's best interest." *Id.* 7(d). The rules provide that GALs "shall state to the court a position and the reasons therefor." *Id.* The policies of the Vermont Guardian ad Litem Program, a program of the Vermont Judiciary, amplify these responsibilities in pertinent part:

> **A Guardian ad Litem serves as:**
>
> . . . .
>
> An **Advocate** for the best interests of the child by assuring the judge is presented with all information he or she needs to further the child's best interests. The Guardian ad Litem is an independent spokesperson whose goal is to ensure the child's best interests receive priority over the best interests of other parties in the case.

A **Facilitator** working to ensure the court, the parties, and service providers work together to meet the child's best interests in a timely fashion.

A **Monitor** of all activities ordered by the court to make certain court orders are followed and to bring any need for enforcement or change in court orders to the attention of the child's attorney. The goal of monitoring is to ensure treatment of the child is sensitive to his or her age and need, and progress towards permanency is reasonable.

*http://www.vermontjudiciary.org/GAL* (follow "About Vermont GALs" hyperlink; then follow "General Description & Role of the Guardian ad Litem" hyperlink).

¶ 11. We have recognized that, where the court is faced with a "lack of neutral witnesses" in a closely contested custody case, the input of a GAL is critical. *Johnson v. Johnson*, 163 Vt. 491, 497, 659 A.2d 1149, 1152 (1995). Although the court "may assign counsel for a minor" in child custody proceedings, V.R.F.P. 7(b), appointment of counsel generally does not occur, and the child's interests must be protected by the GAL. See *Putnam v. Putnam*, 166 Vt. 108, 116, 689 A.2d 446, 450 (1996) (explaining that counsel for the child is generally not assigned, but that minor's interests are "adequately protected" by GALs). A GAL may be called as a witness, if necessary, where his or her testimony "would be directly probative of the child's best interest." V.R.F.P. 7(d).

¶ 12. Even without being called to testify, GALs are under a duty to provide information to the court. Judges depend on GALs, like the other trial participants covered in Canon 3E(1), to "assur[e] the judge is presented with all information he or she needs to further the child's best interests." *http://www.vermont judiciary.org/GAL* (*supra*, ¶ 10). Especially where there is no lawyer for the child, the GAL is an advocate for the child's interest. We hold, therefore, that the duties of GALs in contested custody cases such as the parentage proceeding before us bring them within Canon 3E(1)(d). Because Canon 3E(1)(d) applies, Assistant Judge Manahan should have disclosed her relationship and recused herself when she became aware that her sister was appointed GAL, or the court should have appointed a different GAL.

¶ 13. Two other points bear discussion before we address the issue of remedy. First, because recusal motions must be submitted to the administrative judge, V.R.C.P. 40(e), we review the denial of such a motion for abuse of discretion only. *Ball v. Melsur Corp.*, 161 Vt. 35, 40, 633 A.2d 705, 710 (1993). We cannot, however, impose that standard of review here. The presiding judge never ruled on the motion to disqualify the assistant judge or on the motion for a new trial based on the alleged violation of the Code. The administrative judge refused to rule on the disqualification motion because, by the time it was made, there were no questions of fact remaining before the family court. Thus, there was not an exercise of discretion to review for abuse. We are left in a situation in which we must decide and apply the appropriate standard with no decision to review.

¶ 14. Second, we regret that the issue arose only after the evidence had been taken and the court had rendered its decision, particularly because this is a child custody proceeding in which the imperative is to come to a permanent custody arrangement as soon as reasonably possible. It is undisputed, however, that neither the GAL nor the assistant judge disclosed that they are siblings, and father learned of their relationship only after the decision had been rendered. As the New Hampshire Supreme Court emphasized in *Blaisdell v. City of Rochester*, 609 A.2d 388, 390 (1992): "[W]e caution that it is the judge's responsibility to disclose, *sua sponte*, all information of any potential conflict between himself and the parties or their attorneys when his impartiality might reasonably be questioned. . . . Neither the client nor his attorney have any obligation to investigate the judge's impartiality." While we also regret the expense and anguish that has already gone into this proceeding, it is critical that the decision be viewed as fair. We said in *Ball*:

> [T]he record also shows that the administrative judge acknowledged the potential waste of resources that would result were the five-day trial aborted by a recusal of the trial judge at the end of the third day. Conservation of scarce judicial resources, though a constant concern, does not enter into the consideration of whether recusal is necessary. Rule 40(e)(1) does require recusals to be resolved as soon as practicable, presumably to reduce the risk of waste inherent in mistrials. The rule clearly stipulates, however, that "[a] motion which is filed in

violation of [Rule 40(e)(1)] shall not for this reason be denied"; attorney sanctions are the prescribed deterrent for delay. This provision demonstrates an unwillingness to allow considerations of economy to override assurance of fairness in a matter as important as recusal of the trial judge.

161 Vt. at 41, 633 A.2d at 710-11 (citation and footnote omitted). This reasoning applies with equal force here.

¶ 15. This brings us to the remedy. Our analysis begins with three previous decisions of the Court. The oldest, *Hill v. Wait*, 5 Vt. 124 (1831), well predates the adoption of the Code, but bears a striking resemblance to the facts at bar. There, a justice of the peace rendered judgment over a plaintiff within the fourth degree of relationship to him, contrary to a statute prohibiting justices of the peace from presiding over such parties. *Id.* at 127. We concluded that the judgment "must be pronounced void," *id.*, and therefore affirmed the county court's decision to vacate it. *Id.* at 128.

¶ 16. Later, but also prior to the adoption of the Code, we vacated a decision of an assistant judge who sat as a justice of the peace in violation of the Vermont Constitution. *Watson v. Payne*, 94 Vt. 299, 301, 111 A. 462, 462 (1920). There we cited with approval the rule of many courts that, even where the vote of the disqualified judge is not necessary, "decisions made in disregard of the prohibitions of the law" are void. *Id.* at 302, 111 A. at 463 (quotation omitted). We added:

The same rule has been applied when the disqualified judge has acted simply as one of a bench composed of several judges, even though his vote was not necessary to a decision. The reason . . . is that, "Whatever a party may consent to do, the state cannot afford to yield up its judiciary to such attack and criticism as will inevitably follow upon their decisions made in disregard of the prohibitions of the law." This rule seems to us to be founded upon reason and justice, and in fact to be the only safe rule to follow.

*Id.* at 301-02, 111 A. at 463 (citations omitted). The chief concern in *Watson* was the protection of the appearance of fairness and independence of our legal system.

¶ 17. Finally, and more recently, we affirmed a decision of this Court where all five justices participated in the decision, the unanimous decision was published, and one justice subsequently disqualified himself in response to a motion to do so by a party. *State v. Lund*, 168 Vt. 102, 718 A.2d 413 (1998). There, unlike the previous two cases and the instant case, the appropriateness of the judge's conduct was not at issue because the judge recused himself without any further determination of whether his recusal was required. *Id.* at 110, 718 A.2d at 418. We joined the numerous courts that have held that a unanimous decision need not be vacated where one of the participating justices later recuses himself if the disqualified judge's vote was "mere surplusage." *Id.* at 110-11, 718 A.2d at 418.

¶ 18. In this case, mother is correct that assistant judges perform a unique function in our judicial system; it is precisely this unique role that counsels against affirming the custody order at issue. As discussed above, assistant judges are limited to findings of fact, and the presiding judge must base his or her conclusions of law in part on those findings. *Woodbury*, 161 Vt. at 629, 641 A.2d at 368. As an appellate court, we place substantial reliance on determinations of fact and credibility made by the family court, including assistant judges. See *id.* Ultimately, therefore, this case is more similar to the justice-of-the-peace cases, *Watson* and *Hill*, than it is to *Lund*, especially because, from our removed and deferential review of family court findings, we simply cannot say which fact-finder's work was mere surplusage in the highly fact-sensitive process of making a custody determination. Cf. *Lund*, 168 Vt. at 111, 718 A.2d at 419 (Dooley, J., concurring).

¶ 19. Furthermore, *Lund* involved a unanimous, five-member decision, *id.* at 110, 718 A.2d at 418, whereas here we are effectively dealing with a tie between the presiding and assistant judges. The closeness of the numbers alone renders the "mere surplusage" analysis impracticable in this context. Moreover, if the assistant judge's vote in this case is mere surplusage, the vote of an assistant judge would seem to always be surplusage when there is only one assistant judge and one presiding judge. Thus, parties could be afforded no remedy for ethical violations of the assistant judge, no matter how extreme the conflict of interest. Recognizing *Lund* as the controlling precedent would go too far as it would require us to uphold findings even if, for example, the son or daughter of the assistant judge appeared as a lawyer for

one of the parties. Rather than condition a remedy for the parties on the number of votes alone, we find a more context-specific standard appropriate here, see *id.* at 111, 718 A.2d at 419 (Dooley, J., concurring), particularly where the work of the judge at issue is strictly a determination of fact, on which we are uniquely reliant.

¶ 20. In reaching this conclusion, we recognize mother's argument that the circumstances of the ethical violation in this case are such that there can be no remedy available to father. This argument relies on the unique status of assistant judges and is suggestive of the "mere surplusage" analysis of *Lund*, 168 Vt. at 110-11, 718 A.2d at 418. Mother argues that, since the assistant judge could not sit under the Code, she was unavailable. When both assistant judges are unavailable, as was the case here,[2] the "court shall consist of the presiding judge alone." 4 V.S.A. § 457(c). Similarly, if an assistant judge becomes unavailable during a trial, the matter continues without the assistant judge's participation. *Id.* § 457(f). Thus, mother argues that, because the findings of fact were signed by the presiding judge, they are valid as the product of a lawful court despite the disqualification of the assistant judge.

¶ 21. We cannot accept mother's argument. The assistant judge was available in fact and participated in the decision; it is this participation that led to the issue before us. While we can analogize the situation, as mother urges, to one in which the assistant judge is unavailable, we can also analogize it to a situation in which the assistant judge participates but disagrees with the presiding judge, leaving a tie and no effective vote. Ultimately, our decision here must be made on other grounds. Further, the findings of fact are the joint product of the presiding judge and the assistant judge. We cannot invade the sanctity of the deliberations that led to those findings, nor should we. We must assume that they represent the collegial work product of all participants in the decision. Thus, we cannot assume that the findings would be the same if they had been written by the presiding judge sitting alone.

¶ 22. As we said at the outset, we are particularly concerned here with public confidence in the functioning of the judiciary and the appearance of fairness and independence of our legal system.

---

[2] The other Franklin County assistant judge was unavailable and did not participate in the trial at all.

Even if we could accept mother's position that the assistant judge's participation is surplusage as a matter of law, we doubt that the public could accept that the assistant judge's role as one of two fact-finders in a highly fact-sensitive case did not influence the result. We think the rule that mother espouses would significantly undermine the perception of fairness in family court adjudication.

¶ 23. We return, then, to the general nature of remedies available to litigants for actions taken by a judge after disqualifying circumstances arise. In addition to our own common law, summarized above, some courts have held that actions by a judge who should be disqualified will only be overturned in certain circumstances. Thus, for example, the Supreme Court of North Dakota has held: "Prior orders of a disqualified judge generally are not void where the judge was not personally biased or prejudiced against a party, the disqualification was based on only a possible appearance of impropriety, and the challenged rulings were correct." *Sargent County Bank v. Wentworth,* 547 N.W.2d 753, 760 (1996); see also *Hull & Smith Horse Vans, Inc. v. Carras,* 376 N.W.2d 392, 395 (Mich. Ct. App. 1985); *State v. Alonzo,* 973 P.2d 975, 979 (Utah 1998); *Tennant v. Marion Health Care Found., Inc.,* 459 S.E.2d 374, 386-87 (W. Va. 1995). Decisions from other jurisdictions illustrate both a per se void rule under which all orders of the now-disqualified judge must be vacated, and a more flexible "harmless error" approach. See generally Abramson, *Appearance of Impropriety: Deciding When a Judge's Impartiality "Might Reasonably Be Questioned,"* 14 Geo. J. Legal Ethics 55, 73-74 (2000) (collecting cases).

¶ 24. The most comprehensive analysis of the alternatives to voiding the action of a disqualified judge is contained in *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847 (1988), a decision that has also been adopted in a number of states. See *Abington Ltd. P'ship v. Heublein,* 717 A.2d 1232, 1238 (Conn. 1998) (acknowledging *Liljeberg* and requiring a new trial where judge failed to recuse himself in violation of Canon 3); *Harris v. United States,* 738 A.2d 269, 280 n.20 (D.C. 1999) (describing "different harmless error analysis" under *Liljeberg* for appearances of partiality); *Scott v. United States,* 559 A.2d 745, 750 (D.C. 1989) (explaining that review for "actual prejudice" under the traditional harmless error analysis is "inconsistent with the goal of Canon 3[E(1)] to prevent even the appearance of impropriety");

*Mosley v. State*, 141 S.W.3d 816, 838-39 (Tex. App. 2004) (applying three-prong *Liljeberg* test to determine remedy where judge failed to recuse himself). *Liljeberg* has its critics. See *Blaisdell*, 609 A.2d at 391 (rejecting *Liljeberg*, and describing "inconsisten[cy] with the goals of our code to require certain standards of behavior from the judiciary in the interest of avoiding the appearance of partiality, but then to allow a judge's ruling to stand when those standards have been violated").

¶ 25. In *Liljeberg*, the Court found that the trial judge violated 28 U.S.C. § 455(a) which, like Canon 3, requires a federal judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." The Court deemed the judge's violation of the statute "plain" even though it found his failure to recuse himself to be "the product of a temporary lapse of memory" that the university for which he was a trustee had a financial interest in the trial over which he presided. 486 U.S. at 861. The Court made clear that "[s]cienter is not an element" of a violation of the statute because the standard is whether a judge's " 'impartiality might reasonably be questioned' by other persons." *Id.* at 859 (quoting § 455(a)).

¶ 26. Finding the judge's failure to recuse himself impermissible, the *Liljeberg* Court proceeded to address the issue of remedy. *Id.* at 862. It outlined a three-prong test for determining whether a judgment should be vacated for a violation of the recusal statute. The Court weighed heavily the mere "appearance of impropriety" that resulted in the case, as well as the significance of vacatur as a message to judges and litigants in future cases. *Id.* at 867-68. The Court explained that, in determining the remedy for a judge's failure to disqualify himself, a court must consider: (1) "the risk of injustice to the parties in the particular case," (2) "the risk that the denial of relief will produce injustice in other cases," and (3) "the risk of undermining the public's confidence in the judicial process." *Id.* at 864.

¶ 27. The Court's analysis of the three factors was brief. Taking the third factor first, the Court concluded that, although the judge "did not know of his fiduciary interest in the litigation," he nevertheless "certainly should have known," and the facts created "precisely the kind of appearance of impropriety that § 455(a) was intended to prevent." *Id.* at 867-68. It added that "[t]he violation is neither insubstantial nor excusable," and particularly faulted the judge for denying recusal even after all the facts were known. *Id.*

As to the second factor — the risk of injustice in other cases — the Court stated that "providing relief in cases such as this will not produce injustice in other cases; to the contrary, [it] may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." *Id.* at 868. With respect to this factor, the Court noted that vacatur was appropriate "unless it can be said that respondent did not make a timely request for relief, or that it would otherwise be unfair to deprive the prevailing party of its judgment." *Id.* As to the first factor — fairness to the particular litigants — the Court agreed with the Court of Appeals that there was a "greater risk of unfairness in upholding the judgment . . . than there [was] in allowing a new judge to take a fresh look at the issues." *Id.* Thus, it affirmed the Court of Appeals' order vacating the original judgment.

¶ 28. In general, we endorse the *Liljeberg* approach. We reject the North Dakota Supreme Court's holding that orders of a judge who creates an appearance of impropriety cannot be set aside unless there is a showing of actual bias or prejudice. *Sargent County Bank*, 547 N.W.2d at 760. On this point, we agree with the New Hampshire Supreme Court that such a rule "would be inconsistent with the goals of our code to require certain standards of behavior from the judiciary in the interest of avoiding the appearance of partiality, but then to allow a judge's ruling to stand when those standards have been violated." *Blaisdell*, 609 A.2d at 391. On the other hand, we believe that *Blaisdell*'s holding that a judge's failure to disqualify can never be harmless goes too far.

■ ¶ 29. Applying these factors to the case at bar, we similarly conclude that the family court's custody determination must be vacated and the case remanded for a new trial. Like the United States Supreme Court in *Liljeberg*, we emphasize that the appearance of impropriety here is substantial and the conduct that created it is inexcusable. Here, unlike *Liljeberg*, the assistant judge had actual knowledge of the source of the conflict. Thus, the assistant judge had an independent duty to disclose the relationship that created the conflict of interest and failed to do so.[3] See

---

[3] It may be that the assistant judge thought that the litigants or their lawyers were generally aware of the sibling relationship and would immediately raise a

A.O. 10, Canon 3G ("A judge shall disclose to the parties any fact or matter relevant to the question of impartiality that, in the judge's view, may require disqualification under Section 3E(1).""). In fact, there is no indication that the assistant judge has ever acknowledged the conflict or explained the circumstances that caused her to disregard it. The judge's silence in the face of a motion for a new trial makes the appearance of impropriety even more troubling.[4]

¶ 30. If there is a factor weighing against the remedy of a new trial it is the interests of the litigants. This is a particularly acrimonious custody battle, and the child desperately needs a permanent custodial relationship that continues contact with both parents free from accusations and recriminations. A new trial will not bring about that result quickly, if at all. Moreover, the GAL's on-the-record participation in the proceeding is limited. She submitted a relatively brief written recommendation on custody and otherwise was essentially silent throughout the evidentiary hearings.

¶ 31. But even on this factor, the record supports a new trial. The family court characterized this as a "very difficult and troubling case," suggesting the result was not easily reached. The court ultimately reached the result recommended by the GAL, and it did so at least partially for the reasons advanced by the GAL. The appearance of influence, therefore, is significant. We emphasize that the inquiry with respect to this factor is not whether the decision in question could have been reached based on the evidence before the court. See *Kay S. v. Mark S.*, 142 P.3d 249, 257 (Ariz. Ct. App. 2006) (applying *Liljeberg* factors in divorce case). Particularly because we afford such wide discretion to the family court, we cannot determine with any precision the influence of partiality, if any.

¶ 32. The third factor — the risk of injustice in other cases — also supports a new trial. As the Supreme Court decided in *Liljeberg*, willingness to enforce the ethical requirement here

---

concern if it were warranted. It is not appropriate to make such an assumption. See *Blaisdell*, 609 A.2d at 391. Nor is it appropriate for the judge to require a party or lawyer to raise the issue.

[4] We appreciate that the GAL did address the ethical violation when father filed his motion to disqualify and for a new trial. The GAL's response, however, addressed a claim not made — that she engaged in ex parte communications with the assistant judge.

"may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." 486 U.S. at 868. We agree with the District of Columbia Court of Appeals that granting relief in this case has "prophylactic value." *Scott*, 559 A.2d at 755.

¶ 33. On this factor, we acknowledge that there may exist other contested family court cases in which the assistant judge participated in the decision and her sister served as the GAL. The availability of relief in any such case would require a full analysis of the circumstances, as undertaken here. We would look particularly at whether any complaining party was unaware of the sibling relationship and acted in a timely fashion once becoming aware of it. We find it unlikely that there are a substantial number of cases, if any, that would meet this standard.

¶ 34. Finally, we note that we have applied a similar remedy where we found that a GAL had made a custody recommendation based on information not contained in the record. *Johnson*, 163 Vt. at 497, 659 A.2d at 1153. We noted in *Johnson* that we could not determine the impact of the GAL's custody recommendation but nevertheless reversed the custody decision. *Id.*; see also *Gilbert v. Gilbert*, 163 Vt. 549, 559, 664 A.2d 239, 244 (1995) (reversing and remanding family court's custody determination where it was "impossible to separate" improperly admitted GAL report from other evidence).

¶ 35. Because of our disposition, we do not address father's argument that the court's conclusions were not supported by its findings. In the course of a new trial there will necessarily be new findings. We will, however, briefly address father's claim that the Tyler report was improperly admitted because this issue is likely to be litigated again. By statute, reports of an expert "evaluating the best interests of the child" are admissible to determine parental rights and responsibilities "provided that the expert is available for cross-examination." 15 V.S.A. § 667(b). Dr. Tyler is an expert and she was available for cross-examination. In forming her report, an expert can rely on facts not admissible or admitted into evidence as long as the facts are of a type reasonably relied on by experts in the field. V.R.E. 703. These facts can include hearsay statements. *State v. Prior*, 174 Vt. 49, 56-57, 804 A.2d 770, 776 (2002). Under controlled circumstances, the evidence forming

the basis of the expert's opinion can be admissible on that ground even if it is otherwise inadmissible. See *State v. Recor*, 150 Vt. 40, 48, 549 A.2d 1382, 1388 (1988); Reporter's Notes to 2004 Amendment, V.R.E. 703.

¶ 36. We do not know how the Tyler report will be used on remand, if it all. We do not review its use in forming the decision now on appeal. It is sufficient to say that the family court had discretion to admit it. Father's attempt to liken it to that of a GAL, subject to the limitation on using nonrecord evidence, is unavailing because the report is that of an expert witness as authorized by a rule of evidence and specific statute. V.R.E. 703; 15 V.S.A. § 667(b). Nor are we persuaded that the report's distribution prior to trial was impermissible because it tainted other witnesses.

*Reversed and remanded.*